NOTICE

Decision filed 12/08/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220431-U

NOS. 5-22-0431, 5-22-0432, 5-22-0433,

5-22-0434, 5-22-0435 cons.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* KADRICK H., KALAYZIA H., BRAYLEN W., MAYLAYNA W., and KAMORA W., Minors | ) ) ) | Appeal from the Circuit Court of Williamson County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) ) ) | Nos. 19-JA-75, 19-JA-76, 19-JA-77, 19-JA-78, 19-JA-79 |
| Davina W., | ) | |
| | ) | Honorable Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that the respondent mother was an unfit person because she failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during any nine-month period following adjudication was not against the manifest weight of the evidence. Accordingly, we affirm the court's termination of the respondent mother's parental rights.

¶ 2    The respondent mother, Davina W., is the natural mother of twins, Kadrick H. and Kalayzia

H., born on May 29, 2019, Braylen W., born on May 2, 2018, Maylayna W., born on February 14,

2017, and Kamora W., born on July 21, 2014 (children). On appeal, Davina argues that the trial

court's findings that she was an unfit person under sections 1(D)(g) and 1(D)(m)(i) of the Adoption

1

Act (750 ILCS 50/1(D)(g), (m)(i) (West 2020)) were against the manifest weight of the evidence. For the following reasons, we affirm the trial court's findings.

¶ 3                                    I. BACKGROUND

¶ 4     On June 20, 2019, the Illinois Department of Children and Family Services (DCFS) received information through its hotline regarding a domestic violence incident that occurred on June 19, 2019. The person providing the initial information informed DCFS that Davina was on the phone when her husband, Malik H., became physical with her.

¶ 5     On July 22, 2019, the State filed petitions for adjudication of wardship[1] for each of the children pursuant to section 2-13 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-13 (West 2018)), alleging that the children were neglected or abused pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), because their environment was injurious to their welfare. The State's petition averred that on June 20, 2019, Malik H.[2] was arrested and charged with domestic battery for striking Davina, and striking the minor child, Kamora W. A no contact order was put into effect by the Williamson County court prohibiting Malik H. from being at the residence or having contact with Davina and the children. It was further alleged that Davina informed DCFS that she was not going to obtain an order of protection because there was a no contact order in place. It was further

---

[1]A juvenile petition was filed on behalf of Kadrick H. in matter 19-JA-75; on behalf of Kalayzia H. in matter 19-JA-76; on behalf of Braylen W. in matter 19-JA-77; on behalf of Maylayna W. in matter 19-JA-78; and on behalf of Kamora W. in matter 19-JA-79. The common law records do not contain a circuit court order consolidating the cases; however, the records indicate that the trial court proceeded with the five separate cases as a single matter. As the matters have proceeded as a single case, the cases are consolidated for the purpose of this decision. Further, the majority of orders entered in these cases applied to all four cases without separate findings concerning each minor. Therefore, we will refer to the filings on behalf of the children collectively without separately indicating to which minor child the filing applied unless the filings differ, or such clarification is needed for our analysis.

[2]The juvenile petitions filed on behalf of the children were also filed against Malik H. as the natural father of four of the children, and his parental rights were also terminated. The termination of the Malik H.'s parental rights is not at issue in this appeal, but were addressed in *In re Kadrick H.*, 2022 IL App (5th) 220390-U. As such, this court has limited the summarization of the background information to that information related to Davina and necessary to the issues raised on appeal.

2

alleged that on July 19, 2019, police responded to the residence for a wellness check and found Malik H. at the protected address with the children. Malik H. ran from the police through a window, leaving the residence locked with the children inside. Braylen W., who was one year old at the time, was left on the edge of a bed and the oven was on with food cooking inside of it. Lastly, it was alleged that Davina was aware of all of these facts and allowed Malik H. to return to the residence with the children.

¶ 6 A shelter care hearing was held on July 23, 2019, and a shelter care order was entered the same day. The trial court found that there was probable cause to find that the children were neglected, and that an urgent and immediate necessity existed to support the removal of the children from the home, as remaining in the home would be contrary to their welfare, safety, or best interests. The trial court further found that reasonable efforts could not be made at that time to prevent or eliminate the necessity for the removal of the children from the home. Based on the trial court's findings and pursuant to section 2-10 of the Act (*id*. § 2-10), the children were ordered into the temporary custody of the Guardianship Administrator for DCFS. The trial court also ordered DCFS to investigate the need for domestic violence services, victim counseling, parenting skills, and any other services deemed necessary.

¶ 7 On September 5, 2019, the trial court held an adjudicatory hearing at which Davina was present with counsel. The trial court entered an adjudicatory order finding the children neglected as defined in section 2-3(1)(b) of the Act (*id*. § 2-3(1)(b)), based upon the findings that the children were in an environment that was injurious to their welfare, and that the neglect was inflicted by Davina and Malik H. The order admonished Davina that she must cooperate with DCFS, comply with the terms of her service plan, correct the conditions that required the children to be taken into care, or risk termination of her parental rights.

¶ 8     On September 24, 2019, Caritas Family Solutions (Caritas), acting on behalf of DCFS, filed a dispositional report with the trial court. The dispositional report summarized the circumstances causing the children to be taken into custody and provided a background description of the family. The dispositional report noted that the family was involved with Lutheran Social Services intact program prior to being involved with Caritas. According to the dispositional report, the children were placed in traditional foster care and were adjusting well. The report went on to state that Davina was visiting with the children and Davina was very cooperative with Caritas. The dispositional report noted that Davina was also cooperating in her recommended services, had completed domestic violence services, and was waiting to begin parenting and mental health services. The dispositional report recommended, *inter alia*, that custody and guardianship of the children remain with DCFS and that Davina cooperate with the services outlined in the service plan.

¶ 9     On October 10, 2019, the trial court held a dispositional hearing pursuant to section 2-23 of the Act (*id*. § 2-23) and Davina was present with counsel. The trial court entered a written order on the same day consistent with the dispositional report, finding that Davina was unfit to care for the children because she "needs services," and that reasonable efforts and appropriate services aimed at family reunification had been made to keep the children in the home, but that such efforts had not eliminated the necessity for removal and that leaving the children in the home was contrary to their health, welfare, and safety. While there was no integrated assessment or service plan on file, the dispositional report outlined the services that Davina was expected to complete, and the trial court, without objection, found the service plan to be appropriate.

¶ 10    The trial court's dispositional order found the children were neglected and made them wards of the court. As such, the trial court placed guardianship and custody of the children with DCFS and set the permanency goal as "return home." The trial court again admonished Davina to

4

cooperate with Caritas and that her failure to comply with the terms of the service plan or correct the conditions which required the children to be taken into care could result in the termination of her parental rights.

¶ 11 On February 26, 2020, Caritas filed a permanency hearing report with the trial court. The permanency report noted that Davina and Malik H. reported that they were no longer in a relationship but were still married and in frequent contact with each other. The permanency report further noted that Davina had visits with three of the children without permission of the agency and without agency supervision.

¶ 12 The permanency report went on to note that Davina had made reasonable efforts but not satisfactory progress on her service goals. The report indicated that Davina's service plan included mental health services, domestic violence services, and parenting services. Davina had completed a mental health assessment on August 29, 2019, and Davina reported that she was participating in mental health counseling. She also completed domestic violence counseling and confirmation of completion was received from Centerstone on August 29, 2019.

¶ 13 As to visitation, the permanency report noted that Davina was participating in one visitation per week, lasting two hours, and supervised by agency staff. The permanency report indicated that Davina had not demonstrated appropriate parenting skills. Davina often failed to provide for the children's physical needs, including providing snacks, food, and changing diapers. She was often unwilling to feed the eight-month-old twins, even though the foster parents provided baby food, and became argumentative with the staff when they suggested it was time to feed the twins. According to the permanency report, Davina claimed that the twins were crying because they were sad and not because they were hungry. Davina also attempted to give the twins children's Motrin, which was not an approved medication for children under the age of two. Further, Davina struggled to supervise all of the children and would focus on one child at a time, leaving the other four

5

children to entertain themselves or sit in their car seats. According to the permanency report, Davina would often become overwhelmed when the twins cried at the same time. Davina would typically sit in one spot while the children played in the room, calling the children to her.

¶ 14 The permanency report recommended a permanency goal of return home in 12 months based on the fact that the conditions that had brought the children into care had not been corrected. The recommended permanency goal was based on Davina and Malik H. having violated the no contact order by allowing Malik H. to see the children, and that Davina had not requested a long term no contact order, thereby failing to protect the children from the risk of harm. Further, Davina had not made satisfactory progress in her ability to successfully parent the children.

¶ 15 On March 12, 2020, the trial court conducted a permanency hearing pursuant to section 2-28 of the Act (*id*. § 2-28) and Davina was present with counsel. The trial court made inquiry of counsel and the caseworker regarding the statements, findings, and recommendations contained in the permanency report, noted a general agreement of the parties, and entered a written order the same day. The trial court's written permanency order indicated that the trial court had found that the appropriate permanency goal was return home within 12 months, stating, "Both parents need to work harder to complete tasks. Mother more willing to accept prompts." The trial court's written permanency order also stated that Davina had made some progress towards returning the children home but that the goal of returning home could not be achieved because "[p]arents need to complete services." While there was no service plan on file, the permanency report outlined the services that Davina was expected to complete, and the trial court, without objection, found the service plan to be appropriate. The trial court directed the children to remain in the guardianship and custody of DCFS. Lastly, the trial court ordered DCFS to "slowly increase visits with parents."

¶ 16 On July 30, 2020, Caritas filed a second permanency report with the trial court. The second permanency report indicated that Davina's service plan included mental health services, domestic

6

violence services, and parenting services. The report indicated that Davina had been participating in mental health counseling until her counselor left Centerstone, but that Davina had not been assigned a new counselor. Davina had previously completed domestic violence counseling, and in-home parenting services were scheduled to begin on July 31, 2020. Davina regularly visited with the children, rarely missed a visit, and informed the staff ahead of time if she needed to miss a visit. According to the second permanency report, Davina had made progress in demonstrating her parental capacities during the visits. She brought food and drinks to the visits and was more accepting of feedback offered by agency staff, especially involving the twins. Davina, however, continued to struggle in her parenting skills and engaging all five of the children at the same time, and she was notably frustrated when one or more of the children cried at the same time. Davina would attempt to discuss inappropriate topics with Kamora W. and the caseworker discussed this issue with Davina on multiple occasions. The second permanency report rated Davina as making satisfactory progress and reasonable efforts regarding her service plan and recommended a permanency goal of return home in 12 months based on the fact that the conditions that brought the children into care had not been corrected.

¶ 17    On September 1, 2020, a third permanency report was filed with the trial court. The third permanency report again indicated that Davina's service plan required her to complete mental health services, domestic violence services, and parenting services. As to her mental health services, Davina had not yet been assigned a new mental health counselor and on August 25, 2020, had agreed to reach out to Centerstone to reinstate counseling. Davina had previously completed domestic violence counseling. The permanency report also indicated that a referral was made for Davina on February 6, 2020, to Project 12-Ways, for in-home parenting classes. Davina began Project 12-ways parenting services on July 31, 2020. The in-home parenting classes appear to have been unavailable to Davina until this date, despite it being approximately nine months from the

dispositional hearing date. As to visitation, the third permanency report made the same or similar notations as the second permanency report of July 30, 2020. The third permanency report contained no recommendations for the trial court. The permanency report was submitted on a form with checkboxes indicating recommendations to the trial court, and numerous areas of the form were left blank.

¶ 18    On September 10, 2020, the trial court conducted a second permanency hearing, during which it addressed the issue of there being no recommendations contained in the third permanency report and numerous boxes left unchecked. Further, counsel brought the fact that there was no service plan in the trial court's file to the trial court's attention. Additionally, a pending DCFS investigation regarding Davina was brought to the trial court's attention that had not been included in the third permanency report. The trial court had some discussion with the Caritas representatives and counsels in the courtroom, regarding services, the lack of a current service plan on file, and the necessity to share information with the trial court regarding the fact of a pending investigation involving Davina.

¶ 19    The trial court entered a written permanency order on September 10, 2020. The trial court found that Davina had made "good" progress towards returning the children home but that the goal of returning home could not be achieved because Davina "need[ed] to work harder to complete tasks. Mother more willing to accept prompts." The trial court's written permanency order found, without objection, that "the services contained by the service plan are appropriate and reasonably calculated to facilitate achievement of the permanency goal." After finding that the "[p]arents need to make better progress with the children, their services, and establishing a home," the trial court established a permanency goal of return home within 12 months. The trial court found that the return home goal could not be immediately achieved because "[p]arents need to work harder on services, complete services." Despite the numerous issues addressed by the trial court with the

8

representatives from Caritas, the trial court found that DCFS had made reasonable efforts in providing services to facilitate the achievement of the permanency goal.

¶ 20    On January 21, 2021, Caritas filed a fourth permanency report with the trial court. The fourth permanency report indicated that Davina was rated satisfactory in domestic violence services, but Davina was rated as unsatisfactory in her mental health services since she had not reengaged in services since her counselor left in June 2020. Davina was also rated satisfactory in her parenting services, having completed the Nurturing Parenting Program through Centerstone with documentation received on March 12, 2020, and Project 12-Ways on December 14, 2020.

¶ 21    As to visitation, the fourth permanency report stated that Davina was to begin unsupervised visits on January 27, 2021; however, due to a pending investigation of Davina regarding abuse, the visits remained supervised. It was noted that Davina typically interacted with the children in an age-appropriate manner but, at times, she expected the older children to help care for the younger children. Davina continued to struggle to manage all five of the children at the same time, particularly when multiple children required Davina's attention. On occasion, agency staff were required to step in to ensure the children's safety. One example of this was when the staff had to intervene when Kadrick turned on the stove while Davina had her attention on another child. It was also noted that Davina had improved in her ability to structure the visits, greeted the children appropriately, and did well to transition them after the visit. Davina, however, continued to struggle in areas such as providing proper food, ensuring proper safety measures, and understanding child development and discipline. Davina would yell at the children or ignore their offending behavior entirely. On the other hand, Davina did demonstrate her ability to tend to the children's needs by changing diapers and helping them with the bathroom.

¶ 22    The fourth permanency report recommended a permanency goal of return home within 12 months. This recommendation was made based upon the fact that Davina had not corrected the

conditions that brought the children into care. It was also noted that since August 2020, four investigations had been opened regarding Davina. The first investigation was opened on August 22, 2020, and was deemed "unfounded" on November 20, 2020. Two investigations, opened on September 26, 2020, and October 30, 2020, respectfully, were pending at that time. The fourth investigation, opened on December 3, 2020, was deemed unfounded on December 10, 2020. One of the children, Kamora, was participating in counseling and had reported that she was afraid of Davina, and that there had been instances of abuse by Davina (that were the subject of the above-referenced investigations). Lastly, it was noted that it had been reported that Davina had a paramour, but that Davina denied that.

¶ 23 On January 26, 2021, Caritas filed a DCFS family service plan with the trial court. The service plan required Davina to participate and show progress in mental health treatment; participate and complete a domestic violence assessment and follow all recommendations; successfully complete a parenting program; demonstrate age-appropriate discipline for her children; and engage in appropriate play and supervision during visitation time with her children. The plan noted that Davina was making progress in services, having successfully completed a parenting curriculum, in-home parenting classes, and domestic violence classes. Davina was not, however, participating in mental health services at that time.

¶ 24 On February 2, 2021, Caritas filed an addendum to the fourth permanency report, attaching two DCFS investigation summaries. The addendum noted that while being transported to an unsupervised visit, Kamora W. inquired if anyone other than Davina would be present during the visit, and the agency staff person assured Kamora W. that only Davina would be present. When the children were dropped off, Davina asked the staff person if Malik H. could be present during the visit and the staff person specifically stated that Malik H. could not be present. Based upon the circumstances, agency staff persons made two unannounced "pop-ins" during the visit and

10

determined that no one else was present. After the visit, Kamora W. became upset and informed the agency staff person that Davina had yelled and cursed at the children, and also called Malik H. on Davina's telephone to have Kamora W. talk with Malik H. Based upon this allegation, the caseworker contacted Davina who denied allowing Malik H. to speak with Kamora W., but stated that Kamora W. believed Davina's brother to be Malik H. Later, after the visit, Kamora W.'s foster parent informed the caseworker that Kamora W. disclosed that she had "video chatted" with Malik H. during the visit.

¶ 25    The addendum continued, noting that a staff meeting was held regarding these allegations and that it was unclear what Kamora W. was told or overheard. The hard work that Davina had put in during this case was noted; however, the staff also discussed their ongoing concerns with Davina and made suggestions for possible assistance in these areas. Specifically, it was noted that Davina needed to gain more insight and education into Kamora W.'s trauma by way of possible training for Davina and family counseling with Kamora W.'s counselor.

¶ 26    On February 4, 2021, the trial court conducted a third permanency hearing and entered a permanency order the same day. The permanency order indicated that the trial court found that Davina had made substantial progress towards returning the children home but that the goal of returning home could not be achieved because Davina "need[s] to start mental health services and start unsupervised and overnight visits." The trial court's third permanency order set a permanency goal of return home within 12 months, noting "more services needed."

¶ 27    On March 22, 2021, a fifth permanency report was filed with the trial court. The fifth permanency report indicated that Davina had made satisfactory progress and reasonable efforts regarding her service plan. The permanency report noted that Davina was rated satisfactory in domestic violence services, but Davina was rated as unsatisfactory in her mental health services since she had not reengaged in services since her counselor left in June 2020. Lastly, Davina was

rated satisfactory in her parenting services, having completed those services on December 14, 2020.

¶ 28    As to visitation, the fifth permanency report indicated that Davina had not missed a visit during this permanency period, had demonstrated an ability to interact with the children in an age-appropriate manner, and had provided meals for the children during the supervised visits. Further, Davina had improved in her management of all five of the children at the same time although she did need occasional help from agency staff. Accordingly, Caritas requested the discretion to allow both unsupervised visitation and unsupervised, overnight visitation.

¶ 29    The fifth permanency report recommended a permanency goal of return home within 12 months. This recommendation was made based upon the fact that Davina had not corrected the conditions that had brought the children into care. It was believed that Davina was in a relationship with a man named Amos N., who had a violent past, and the caseworker was awaiting the full results of Amos N.'s background check. The caseworker noted that Davina initially denied this relationship in January 2021, but then later confirmed the relationship in March 2021. After finally obtaining Amos N.'s correct telephone number, the caseworker scheduled an integrated assessment with Amos N.

¶ 30    The fifth permanency report noted that Davina had demonstrated that she did not understand Kamora W.'s trauma and triggers surrounding domestic violence and the incident that brought the children into care. It was believed that Malik H. had recently given a gift to Kamora W. and that this was inappropriate due to Kamora W.'s expressed fear of Malik H. Davina was aware of Kamora W.'s fear of Malik H. and the requirement that Kamora W. have no contact with Malik H.; however, Davina continued to allow the contact. Kamora W. had begun individual therapy and the caseworker wanted to include Davina; however, Davina could not participate until she had completed her own mental health services.

12

¶ 31    On April 1, 2021, the trial court conducted a fourth permanency hearing, with Davina being present with counsel. The trial court entered a written permanency order finding that Davina had made substantial progress towards returning the children home but that the goal of returning home could not be achieved because "services need to be completed." The trial court's written fourth permanency order entered a permanency goal of return home within 12 months.

¶ 32    On August 2, 2021, the State filed a petition for termination of parental rights and appointment of a guardian with power to consent to adoption. The State's petition alleged three grounds of unfitness. First, the State contended that Davina was an unfit person as defined in section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)) for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the parent during any nine-month period following the adjudication of neglect or abuse. Second, the State alleged that Davina was an unfit person as defined in section 1(D)(b) of the Adoption Act (*id*. § 1(D)(b)) for failing to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. Third, the State's petition alleged that Davina was an unfit person as defined in section 1(D)(g) of the Adoption Act (*id*. § 1(D)(g)) for failing to protect the children from conditions within their environment injurious to the children's welfare. The State's petition for termination requested that Davina's parental rights be terminated regarding the children and that DCFS be granted authority to consent to the adoption of the children.

¶ 33    On August 5, 2021, Caritas filed a sixth permanency report, which indicated that Davina had made reasonable efforts but not satisfactory progress regarding her service plan. The sixth permanency report indicated that Davina had completed her domestic violence and parenting services, but Davina was also required to complete mental health services. The caseworker spoke with the provider of Davina's mental health services on August 3, 2021, and determined that Davina had been inconsistent with appointments when participating and was discharged

13

unsuccessfully from the services. Davina had recently set up a new mental health assessment, but it had not been completed at the time of the report. The sixth permanency report also indicated that stable housing and proof of legal income had become recent concerns as Davina was evicted from her four-bedroom apartment. A housing advocate was requested to assist Davina in securing appropriate housing; however, she remained on a waiting list.

¶ 34    The sixth permanency report further noted that while Davina had completed domestic violence counseling on August 29, 2019, she became involved in another domestically violent relationship with Amos N. in February 2021. Amos N. had a lengthy criminal history involving abuse, dangerous drugs, and unlawful use of firearms. Davina reported that she no longer had contact with Amos N.; however, she was seen by a Caritas supervisor with Amos N. at the Williamson County Courthouse on May 24, 2021. While Davina denied being in a relationship, Amos N. accused Davina of stealing his car and showed up at her residence on or about April 9, 2021, where he "bash[ed] her car windows in." At that time, visitation was removed from Davina's home and placed back at the agency due to safety risks.

¶ 35    As to parenting, the sixth permanency report indicated that Davina successfully completed her parenting services on December 14, 2020. The sixth permanency report noted that in addition to the classes, Davina was to demonstrate the skills she learned through her parenting education. Davina continued to have a difficult time managing the five children during her three-hour supervised visitation each week. Much of Davina's visitation time was reported as being spent inspecting the children for bumps or bruising, critiquing the children's hair, and making allegations against the foster placements. Davina was expected, and had been asked, to provide an adequate meal for the children, diapers, and wipes during the visits as well. The sixth permanency report indicated that while Davina provided food, occasionally the meals were unhealthy snack items. Davina also rarely brought diapers to change the children and reluctantly changed them only when

14

prompted by agency staff. The sixth permanency report noted that Davina had not demonstrated appropriate parenting and disciplinary techniques and demonstrated a lack of understanding of appropriate childcare techniques. The sixth permanency report recommended that the permanency goal be changed to substitute care pending court determination on termination of parental rights. On August 19, 2021, the trial court conducted a fifth permanency hearing and entered a written permanency order changing the permanency goal to substitute care pending court determination on termination of parental rights because the "state has filed petition to terminate parental rights."

¶ 36     On January 31, 2022, Caritas filed a document titled "Information for the Termination of Parental Rights hearing scheduled for February 3rd, 2022" (parental rights report). According to the parental rights report, on January 2, 2022, Davina was arrested for driving on a suspended license and was being evicted from her residence. Overall, Davina was rated unsatisfactory in her service plans dated March 25, 2021, July 11, 2021, and January 19, 2022. As to her mental health services, Davina was rated satisfactory for the January 11, 2020, June 25, 2020, and December 3, 2020, service plans but unsatisfactory for the service plans of March 25, 2021, July 11, 2021, and January 19, 2022.

¶ 37     Regarding Davina's parenting education services and demonstrating learned skills, she was rated satisfactory for the June 25, 2020, and March 25, 2021, service plans but unsatisfactory for the service plans of June 25, 2020, July 11, 2021, and January 19, 2022. Concerning Davina's domestic violence counseling, she was rated satisfactory for the January 11, 2020, June 25, 2020, December 2, 2020, and March 25, 2021, service plans but unsatisfactory for the service plans of July 11, 2021, and January 19, 2022.

¶ 38     According to the parental rights report, the tasks of Davina providing proof of legal income and stable housing were added to the service plan on July 11, 2021, and she was rated unsatisfactory on both tasks for the service plans of July 11, 2021, and January 19, 2022. As to

proof of legal income, the parental rights report noted that Davina reported working "under the table" for cash since the beginning of the case. She further reported several other legal jobs but never provided any documentation to confirm her employment. As to stable housing, Davina was evicted from her residence in October 2021 and reported that she currently lived with a friend. Davina was provided a housing advocate in October 2021, but Davina failed to maintain contact with the advocate, resulting in her being removed from that program.

¶ 39 The parental rights report then noted that Davina's visits were changed to one hour per month due to the filing of the petition to terminate. Davina continued to struggle to fully engage with the children during the visits and often times seemed overwhelmed when one or more of the children became upset or cried. Davina often yelled at the children to stop or immediately put them in a "time out" rather than talking through the situation. Most of the food provided by Davina was unhealthy and she did not bring diapers as instructed. Further, in the past, Davina had spent much of the visitation time inspecting the children for bruising or marks in order to make reports against the foster parents. All these reports were unfounded and many of the marks were normal and natural due to the children's age from everyday play.

¶ 40 In summary, the parental rights report noted that Davina had completed domestic violence and parenting skills services very early in the case. As the case progressed, however, she did not demonstrate any learned skills, began a domestically violent relationship with Amos N. in early 2021, and remained in that relationship even after a violent incident occurred at her home. At the time that the parental rights report was prepared, it was believed Davina was still in a relationship with Amos N., which Davina denied, but social media posts indicated otherwise. Further, Davina had never fully completed her mental health services. In the past, Davina reported not knowing she needed services and then stopped attending. Davina obtained a mental health assessment in August 2021 but failed to maintain contact with the counselor to begin sessions. She also obtained

16

a third assessment on January 21, 2022, and was recommended for mental health services. Davina was not living in her own home and had no proof of legal income. The parental rights report concluded by noting that Davina had ample opportunity to complete her required services since the cases were opened on July 19, 2019, that the children had been in care for 927 days, and that the children were extremely bonded to their respective foster families.

¶ 41    On March 31, 2022, the trial court began the hearing on the fitness portion of the State's petition to terminate Davina's parental rights. The trial court heard testimony from Aubrey Berry, who testified that she was employed by Caritas and was the caseworker in this matter from November 2019 through May 2021. According to Berry, in November 2019, a service plan was in place, but an integrated assessment had not been completed. Berry stated the integrated assessment involving Davina occurred in June 2020, which Berry explained, was due to her mistaken belief that an assessment had been previously conducted. Berry continued by stating that Davina was initially involved in her mental health, domestic violence, and parenting services. According to Berry, for the period of time from the adjudication on September 5, 2019, through January 2020, she rated Davina as satisfactory in domestic violence and parenting services but unsatisfactory in mental health services. Berry further testified that Davina was consistent in her visitation with the children during that timeframe.

¶ 42    Berry then testified regarding the period of time from January 2020 through July 2020, stating that Davina was cooperating with services and rated satisfactory in her mental health and domestic violence services but unsatisfactory in her parenting services. During that time, Davina began her in-home parenting classes. The next period of time was from July 2020 through January 2021, and, according to Berry's testimony, Davina was only rated satisfactory in her domestic violence services. Regarding Davina's mental health services, Berry explained that Davina's counselor left the agency in June 2020, that services were halted, and that it was recommended

17

that Davina continue her services with another counselor. Berry testified that Davina did not continue with her mental health services. As to parenting services, Berry stated that Davina had begun Project 12-Ways in late 2020 but had not completed the services during that period. Therefore, she was rated as unsatisfactory. Berry further stated that in-person visitation was halted during this period of time due to the COVID-19 pandemic, but that Davina continued having telephone visits with the children. Berry stated that Davina consistently attended visitations once in-person visits were reinstated.

¶ 43 Berry then testified regarding the period of time from January 2021 through July 2021, stating that no new services were added to the service plan. Berry stated that Davina completed Project 12-Ways and was rated satisfactory in her parenting services. According to Berry's testimony, Davina needed to complete her mental health services but was not engaged in those services at that time. Davina was attending visitations with the children. Berry then testified regarding the difficulties Kamora W. was having after visits and that she had begun counseling in August 2020. Berry stated that Kamora W.'s counselor wanted counseling with Kamora W. and Davina, but that this was not possible since Davina had not completed her own mental health services.

¶ 44 The guardian *ad litem* (GAL) questioned Berry regarding Davina's progress. Berry testified that the main issue regarding Davina's progress was her failure to complete her mental health counseling. Berry then stated that Davina had completed her domestic violence counseling in 2019; however, she then entered into a relationship with a person with a history of domestic violence.

¶ 45 Berry was then cross-examined by Malik H.'s attorney regarding the service plans in this case. Berry testified that a service plan should have been implemented every six months after the opening of the case and that those service plans should have been filed with the trial court. When

asked if Berry would be surprised to know that the first service plan was filed on January 26, 2021, she responded: "Yes, ma'am. That would surprise me." When questioned further, Berry agreed that from November 2019 to May 2021, she was responsible for filing the service plans but acknowledged that "I must not have." Berry was then extensively questioned regarding the service plans and the trial court's previous comments and admonishments regarding the filing of the service plans. The trial court then recessed and continued the matter for further hearing.

¶ 46    On June 13, 2022, the trial court reconvened the fitness hearing. The trial court heard testimony from Marcus Clarry, who testified that he was a Caritas caseworker and became involved in the cases in May 2021, taking the cases from Aubrey Berry. Clarry stated that he had reviewed the case file and that there was a service plan in effect in May 2021. Clarry explained that service plans are evaluated every six months and that he evaluated this case's service plan in July 2021. According to Clarry's testimony, Davina's service plan required her to do mental health and domestic violence counseling, parenting classes, provide stable housing, proof of legal income, and cooperate with Caritas. At the time Clarry took over the case, Davina was rated unsatisfactory in her mental health services because she was not engaged in those services at that time. Clarry stated that Davina had previously engaged in mental health services with Centerstone but did not complete the services. Davina was also rated unsatisfactory in her domestic violence services. Clarry testified that Davina had completed her domestic violence services early in the case, but that she entered into a domestically violent relationship with Amos N. in March 2021. Clarry testified that an incident had occurred at Davina's residence which caused Caritas to remove visitation from occurring in Davina's home. Based upon that incident, Davina was informed that she needed to reengage in domestic violence services.

¶ 47    Clarry further testified that Davina was rated unsatisfactory in her parenting services, stating that she was unable to demonstrate the skills that she had learned in her parenting classes.

19

According to Clarry, visitation "was very hard" for Davina and she had difficulty handling all five of the children at one time. Clarry testified that the task of having stable housing was not in Davina's June 2021 service plan but was added in October 2021, due to her eviction. As to stable income, Clarry stated this task was rated unsatisfactory due to Davina being paid cash "under the table" and the agency was never able to verify that income. Clarry also stated that Davina had later informed Clarry that she was working at hotels but never provided any pay stubs to verify that income. Davina was rated satisfactory in cooperating with the agency and with her visitation schedule. Clarry further testified regarding Davina's continuing relationship with Amos N., stating that Davina never "outright" disclosed the relationship but that there was evidence of the relationship via social media. Clarry also testified that Davina was recently arrested while Amos N. was a passenger in her car. Finally, Clarry stated that there was an incident of domestic violence between Davina and Amos N. in March 2021.

¶ 48    During cross-examination by Malik H.'s attorney, Clarry was questioned regarding the various service plans in the cases. Clarry stated that, in June 2021, he reviewed the service plan created by Berry in March 2021, and in July 2021, he reviewed the July 2021 service plan with Davina. When asked if the March 2021 service plan was the first to be actually filed with the trial court, Clarry responded that he did not believe so. Clarry explained that he had contacted the Williamson County circuit clerk, and that it was difficult to understand and determine what had been filed due to there being five children and, therefore, five case files. Clarry acknowledged that "everything needs to be filed in each—each case number." He further testified that he believed several other service plans were filed but could not state that for sure. Clarry acknowledged that he would be surprised to learn that the first time Berry filed a service plan was in September 2020. According to Clarry, he was aware that there were three service plans in place prior to September 2020, and it was his understanding that they had been filed.

20

¶ 49    During cross-examination by Davina's attorney, Clarry was asked if he agreed that the March 12, 2020, permanency order indicated that Davina was making satisfactory progress. Clarry testified that Davina was making progress early in the case; however, she entered into the relationship with Amos N. around March 2021, and "that's around the time when things began to—to go south." According to Clarry, Davina discontinued her mental health services on her own, without being informed that she had successfully completed them. After March 2021, before Clarry took the cases over, visitation was very difficult and Davina was overwhelmed at times, unable to provide diapers, baby wipes, and food. Clarry continued, stating that once he took the cases over, he also witnessed Davina's difficulties during the visits. According to Clarry, although Davina "may have been satisfactory early on in the case, things changed."

¶ 50    Clarry acknowledged that the February 4, 2021, permanency order indicated that Davina had made substantial progress and that the April 1, 2021, permanency order indicated that some services needed to be completed. When questioned regarding the planned goal of returning the children home in July 2021, Clarry reiterated that the reason the children originally came into care was that there was domestic violence in the home with Malik H. Clarry continued stating that Davina then entered into another domestically violent relationship with Amos N., a known criminal, and denied she was in the relationship for several months. Even after the domestic violence incident between Davina and Amos N., a case supervisor observed Davina and Amos N. arrive together at the courthouse for a criminal hearing, with Davina later denying she was there that day. When questioned regarding the allegation that Davina was no longer concerned about the children, Clarry stated that throughout Davina's visitations, she had a difficult time watching all five of the children. According to Clarry, Davina had avoided activities with the children and would pay attention to one particular child at a certain time, sometimes one child throughout the whole visit, and allowed the other children to "do as they please at times." Clarry testified that this

issue was discussed several times with Davina, along with spending less time pointing out bumps and bruises in an effort to come up with a reason to call the hotline and indicate the foster parents for possible abuse.

¶ 51    When questioned regarding an incident where Davina had found bruising on one of the children, Clarry testified that he personally examined the particular child and observed a "minor bump" on the leg of the child which, upon speaking with the foster parents, had a logical explanation for the bruise and no reason for DCFS to "indicate" the foster parents. Clarry continued stating that this incident involved "normal bruising" by explaining the considerations he used when making his determination.

¶ 52    Clarry then testified that he did not recall if unsupervised visits began on January 27, 2021, since he was not involved in the cases at that time. Clarry did state that visitation had been moved to Davina's home and was unsupervised. It was Clarry's recollection that Davina was receiving four hours of visitation once a week and that Davina had completed Project 12-Ways prior to his involvement in the case. Clarry then testified that the August 2, 2021, permanency report indicated that Davina was making unsuccessful progress towards her service goals. Clarry stated that, at that time, he had informed Davina that she needed to complete further domestic violence services and needed to reengage in mental health services to be successfully discharged from those services so that the children could be returned home. Clarry further testified that Davina was asked to leave her housing since the children no longer resided with her. Davina denied being evicted but later admitted she had been evicted. Clarry then obtained a housing advocate to assist Davina in securing stable housing. The housing advocate reached out to Davina to meet with her but, as time went on, Davina was not in consistent contact. According to Clarry, Davina did not have stable housing at the time of the hearing.

¶ 53     On redirect examination, Clarry acknowledged that Davina's unsupervised visitation was stopped shortly after the April 2021 permanency hearing due to the domestic violence incident between Davina and Amos N. Clarry testified that Davina was not rated satisfactory in all aspects of her service plan at the time the petition for termination of parental rights was filed in August 2021, and further added that Davina had not completed all tasks since the petition was filed.

¶ 54     The State rested and counsel for the State requested that the trial court take judicial notice of the service plans, permanency reports, and permanency orders in the case. The trial court discussed the service plans in the cases to determine where they might be found in the various case files. Ultimately, the trial court took judicial notice of the January 26, 2021, and January 25, 2022, service plans and all of the permanency orders in the cases. In his case-in-chief, Malik H.'s attorney requested that the trial court take judicial notice of the transcript of the September 10, 2020, permanency hearing, specifically pages 12 through 14, wherein the trial judge addressed the issue of the service plans not being filed.

¶ 55     Davina was then called to testify on her own behalf. Davina stated that she was currently staying with a friend in Carbondale, Illinois, after being evicted from her home on November 2, 2021. Davina testified that she was looking for a residence and was employed by the Quality Inn in Marion, Illinois. When questioned regarding the allegation that she failed to make reasonable efforts to correct the conditions that were the basis for the children's removal, Davina testified that she was doing mental health counseling, but that she had not heard from her counselor "Blair," and that Davina had been trying to contact the counselor. According to Davina, Centerstone was supposed to give her a new counselor. Counsel asked Davina if Aubrey Berry had given Davina a "plan for you to get—how you were supposed to get your counseling and what you were supposed to do back when you first got into the program?" Davina answered: "I had—she told me to do

counseling but not, like, mental health. And I tried to do mental health, and they asked me why did I need to do it."

¶ 56    Davina acknowledged that the permanency reports indicated that she had three tasks to complete which were mental health, domestic violence, and parenting services. According to Davina, she had completed the parenting and domestic violence services as of March 21, 2021, but not the mental health services. Davina stated that she received a mental health assessment from Centerstone in 2020 but that Centerstone did not provide her mental health counseling. Davina testified that she spoke with Berry about this but that Berry "didn't really respond to it. She told me to do it, call them." Davina stated that she contacted Centerstone but that they did not see a reason for her to do mental health. Davina stated that she continued in the services because that was what Berry wanted Davina to do. Davina acknowledged that the permanency reports indicated she was rated unsatisfactory on mental health and testified that she spoke with her counselor about that and completed three assessments.

¶ 57    When questioned regarding the allegation that she failed to maintain a reasonable degree of interest, concern, or responsibility about the children's welfare, Davina disagreed with that allegation. Davina testified that she had called Berry "several times a week" but that Berry would never answer her telephone. Further, Davina stated that she would go to the agency office, but that Berry would not be there. Davina stated that she would also leave voicemails and texts, but Berry would not call or text back. As to her contact with Clarry, Davina stated that she might have spoken with him "like, when it's close to time for court. I don't really see him often at all." When asked if she ever contacted Clarry regarding the failures she was claimed to have made, Davina stated that she did call Clarry.

¶ 58    Davina was then questioned regarding the February 2021 incident involving Amos N. Davina explained that she and Amos N. had gotten into an argument but that they were not in a

relationship. Davina stated that Clarry said he had seen something on social media and assumed Davina and Amos N. were in a relationship. She again denied there being a relationship. According to Davina, Clarry believed there was such a relationship and told Davina to redo domestic violence because he looked up Amos N.'s background and he had been to prison. According to Davina, she did domestic violence counseling again, but Clarry did not tell her to redo parenting classes; rather, Clarry informed her that she had completed parenting. Further, Davina stated that Clarry told Davina to reengage in mental health counseling and she had obtained an assessment and counseling with "Blair." According to Davina, Centerstone informed Clarry that Davina was in mental health counseling with Blair, but that Davina had not completed the counseling. Davina explained that she would speak with Blair over the phone one time per week for an hour, due to the COVID-19 pandemic.

¶ 59    Davina went on to testify that at the end of 2021, Clarry informed her that an attempt to terminate her parental rights would begin. Davina testified that when the case began, she had received supervised visitation for three hours once a week. According to Davina, the visits occurred at the McDonald's restaurant in Mt. Vernon, Illinois, which made the visits difficult for her because the children were running all over McDonald's while other patrons were eating. She further explained that the children would be sitting in highchairs and that there was no play area at that location. Davina continued by stating that she was unaware that some of the permanency reports criticized her parenting of the children. She then stated that while at the McDonald's it was wild and that it became hard to handle all five of the children because it was uncomfortable for them, and they were crying and were loud.

¶ 60    The visits were then moved to the Caritas office in Mt. Vernon. Davina testified that during that time she would cook meals and take them to the visits. Sometimes the children would want McDonald's to eat, and sometimes they asked for Taco Bell, which she would provide for them.

25

Davina explained that she was prepared for visits and had a suitcase with diapers, wipes, a first-aid kit, teething medicine, diaper rash ointment, and extra children's clothing that she would take to visits. According to Davina, she was not offered transportation to the visits in Mt. Vernon but never missed a visit. Davina testified that no one discussed with her that she was not bringing diapers to the visits until she was in court, which surprised her. Davina disagreed that the food she brought to the visits were sweets.

¶ 61    Davina then testified that she had received one unsupervised visit. She stated the visit was three hours long and that "they" came every hour to check on the children. Davina continued, stating that she and the children played and danced around during the visit. Davina stated that Kamora W. became upset at the visit because they had cupcakes and Davina would not allow Kamora W. to have three or four of the cupcakes, which upset Kamora W. Davina described the visit as going well. Davina further stated that the children never want her to leave the visits. According to Davina, the children would be crying, not wanting to leave, and she would explain to them that they could not stay with her. Davina stated that she was surprised to learn that Kamora W. was upset over the unsupervised visits. Further, Davina testified that she did not allow Malik H. to speak with Kamora W. during the visits.

¶ 62    Davina testified that after the filing of the petition to terminate, she continued to have visits, adding that the children still asked about coming home. Davina testified that she would like the children returned home and that she would be willing to take the mental health, domestic violence, and parenting courses. Further, she stated that she tried to contact the housing advocate a few times the previous week, but he was always in a meeting. She testified that she would try to contact him again today or just go by his office. Davina indicated that they were close to getting her a place to live. Davina explained that she was working, had transportation, and was moving forward in her life.

26

¶ 63    On cross-examination, Davina testified that she did have a home as of August 2021, before she was evicted. She further stated that she had obtained transportation "almost a month ago" and that she had completed domestic violence services at the Women's Center in Marion, Illinois. Regarding the incident where Amos N. damaged her vehicle, Davina stated that she did file charges against Amos N. and did not drop the charges. Davina then testified that her driver's license was currently suspended but would be reinstated once she purchased appropriate insurance. Further, Davina testified that she had completed Project 12-Ways during the summer of 2020.

¶ 64    Upon questioning by the GAL, Davina acknowledged that in April 2021, after the incident where Amos N. broke her car window, she was advised to go back for additional domestic violence services. Davina stated that she did complete a six-week program in August 2021 and provided a certificate of completion to her caseworker. Davina then testified that she began working at the Quality Inn in April 2022, worked at the Holiday Inn Express from the beginning of February to March 2, 2022, and worked at Crownline temporarily in December 2021. Davina testified that she was not employed prior to December 2021. According to Davina, her in-home visits began around May 2020 and ceased in March 2021. As to her relationship with Amos N., Davina stated that Amos N. wanted to be in a relationship but that when she explained her situation to him, he got mad and was stalking her. According to Davina, that was when Amos N. broke out her car window. Davina then testified that she was not aware that Amos N. was added to her service plan but stated that Amos N. was supposed to meet with Berry. According to Davina, she had reviewed her service plan that was filed in January 2022, but she never saw anything regarding Amos N. in the plan. Lastly, Davina denied coming to the courthouse with Amos N.

¶ 65    On redirect examination, Davina stated that she had completed Project 12-Ways in December 2020 and domestic violence classes in August 2019. She further added that she had been employed at Timberline for about a month early in the case and had made several applications

27

and calls seeking work but that nobody was hiring due to the COVID-19 pandemic. Davina further stated that she had a certificate for the second domestic violence class she attended at the Women's Center and could provide it to the trial court. She also testified that she had provided the certificate to the proper person and signed a release so that the Women's Center could provide the certificate to Caritas. Davina explained that in 2020, she was having supervised visits with the children at her home for three hours each week. According to Davina, she had one unsupervised visit at her home in January 2021, but the visits were supervised at the Caritas office thereafter. Davina reiterated that she had repeated the domestic violence classes but had not repeated the parenting classes. When asked by the judge if anyone had asked her to repeat the parenting classes, Davina answered "no."

¶ 66    The GAL then questioned Davina regarding her arrest on January 31, 2022. Davina acknowledged that law enforcement stopped her on that date and that Amos N. was in the vehicle with her. Davina further acknowledged that she was placed under arrest and her car was searched by law enforcement. Davina denied that law enforcement found a glass jar containing cannabis in her purse and did not recall being criminally charged with possession of cannabis by a driver. Further, Davina stated that she was unaware that she had failed to appear for a court date on May 10, 2022, and that there presently was an outstanding warrant for her arrest. Davina acknowledged that in April 2022, Amos N. had "destroyed" her apartment and poured motor oil in it. Davina then acknowledged that she was unsuccessfully discharged from her mental health services on May 28, 2022. At the close of the GAL's questioning, the trial court took judicial notice of Davina's pending criminal charges.

¶ 67    After the parties' closing arguments, the trial court made its findings and ruling on the record. The trial court found that the State had failed to meet its burden of proof as to the allegation that Davina failed to maintain a reasonable degree of interest, concern, or welfare with regard to

28

the children. The trial court found that the State did meet its burden of proof on the remaining two allegations that Davina failed protect the children from conditions within their environment that were injurious to their welfare and failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children.

¶ 68    The trial court found, in regard to reasonable efforts, that Davina was initially making reasonable efforts early in the case, completing all of her services except for her mental health counseling. The trial court, however, found that the reason the children came into care was the issue of domestic violence. The trial court pointed out that Davina was involved with services as an intact case prior to the children coming into care and, during that intact case, Malik H. was allowed back in the home and caring for the children. Davina had not complied with the safety plan to protect the children from the perpetrator of the domestic violence. The trial court pointed out that when Davina was very close to achieving the goal of return home, she had entered into another relationship, whatever the nature of the relationship was, that again resulted in destruction of property, stalking, and domestic violence. The trial court found that the case was almost three years old, and that three years was ample time for the services to be completed and for the children to be returned home. Therefore, the trial court found that Davina was an unfit person to have the children in her care for failure to protect the children from conditions within their environment that were injurious to their welfare and for failure by Davina to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following adjudication. The trial court noted that Davina had not completed her services during any nine-month period since the case began, and that the most recent nine-month period returned to "square one" because of the new domestic violence issues. Further, the trial court noted that Davina did not have housing for the children to be returned to her care.

¶ 69    The trial court then proceeded to the best interests hearing. The trial court heard testimony from four witnesses,[3] including Davina, and found that the State had proven, by a preponderance of the evidence, that it was in the children's best interests that Davina's parental rights be terminated.

¶ 70    The trial court entered a written order on June 15, 2022, stating that Davina was found to be an unfit person as defined in sections 1(D)(g) and 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(g), (m)(ii) (West 2020)). The trial court's written order further stated that it had found that it was in the best interests of the children, and of the public, that all residual and natural parental rights and responsibilities of Davina be terminated. As such, the trial court's written order terminated the parental rights and responsibilities of Davina regarding the children.

¶ 71    Davina now appeals the trial court's judgment terminating her parental rights arguing that the trial court's finding that she was an unfit person was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the trial court.

¶ 72                                II. ANALYSIS

¶ 73    Termination of parental rights proceedings are governed by the Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). The Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an "unfit person," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the minor child's best interests. 705 ILCS 405/2-29(2) (West 2020); *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 28. Although

_____

[3]Because the trial court's finding on the best interests of the children is not at issue in this appeal, this court will not set forth a summary of the witnesses' testimony at the best interests hearing.

section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed "unfit," any one ground, properly proven, is sufficient to enter a finding of unfitness. See 750 ILCS 50/1(D) (West 2020) (providing that the "[t]he grounds of unfitness are any one or more of the following [enumerated grounds]"). In this matter, Davina does not challenge the trial court's finding that termination of her parental rights was in the best interests of the children. As such, our analysis will focus on the trial court's unfitness determination.

¶ 74    Here, Davina contends that the trial court's finding that she was unfit was against the manifest weight of the evidence. The trial court determined that Davina was an unfit person based upon two grounds. The trial court found that Davina was an unfit person for failing to protect the children from conditions within their environment injurious to the children's welfare, and for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the home during any nine-month period following the adjudication of neglect on September 5, 2019.

¶ 75    We will begin our analysis with the trial court's finding that Davina was an unfit person for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the home. The trial courts' determination of unfitness involves factual findings and credibility assessments, and the trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). A determination is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 76    Reasonable efforts relate to the goal of correcting the conditions that caused the children's removal and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. For reasonable efforts, the trial court must determine whether the parent has made earnest and conscientious effort toward

correcting the conditions that led to the removal of the children from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 77 The State's petition for termination of parental rights alleged that Davina did not make reasonable efforts during any nine-month period after the adjudication of neglect. There were three nine-month time periods between the adjudication of neglect and the fitness hearing: September 6, 2019, through June 6, 2020; June 7, 2020, through March 7, 2021; and March 8, 2021, through December 8, 2021.

¶ 78 In arguing that the trial court's finding that Davina failed to make reasonable efforts was against the manifest weight of the evidence, Davina contends that she had completed, or was in the process of completing, the required services during the first and second nine-month periods after adjudication. Davina argues that these services were being completed even though she was not provided a service plan. According to Davina, she was "set up for failure" due to the lack of the filing of a service plan within the 45-day period ordered by the trial court, which required the filing by August 16, 2019. Davina argues that no service plan was filed until late 2020 or early 2021. Finally, Davina argues that there was a lack of urgency to see her progress in her required services and that unsupervised visitation did not begin until January 2021, even though the trial court had ordered her visitation time to be increased.

¶ 79 The children were taken into shelter care in July 2019, after Davina left them with Malik H. despite a requirement that he not have any contact with the children. During a wellness check at Davina's apartment, Malik H. left the children, who ranged in ages from five years of age to two months old, unsupervised when he fled from police, leaving the doors locked. The police climbed through a window to enter the residence where they discovered the children alone, and that the oven was left on and the one-year-old was left lying on a bed where he could have easily fallen off. Prior to this, there was a domestic violence incident where Malik H. struck Davina in

32

the face multiple times and also struck her oldest daughter. Davina's service plan tasks included parenting services, mental health services, domestic violence services, maintaining stable housing, and a stable income.

¶ 80    Davina did make some efforts toward completing her services during the initial nine-month period. Davina had stable housing, had completed her domestic violence services, and was participating in her mental health services. However, the testimony presented at the fitness hearing was that Davina was inconsistent in attending her mental health appointments and was later unsuccessfully discharged for her nonattendance.

¶ 81    Davina also made efforts toward the completion of her service plan during the second nine-month period. She began parenting services promptly when they were made available in March 2020. Davina completed her parenting services and displayed improvement in her parenting skills during visits. Davina, however, failed to reengage in her mental health services after being specifically advised to do so. Further, although Davina consistently attended her visits with the children, she exhibited a lack of basic parenting skills. Davina had one unsupervised visit in February 2021, after which supervised visits were reinstated based on the allegations made by Kamora W. about Davina's behavior during the visit, and allegedly allowing phone contact with Malik H.

¶ 82    During the third nine-month period of March 8, 2021, through December 8, 2021, the testimony demonstrated that Davina was rated unsatisfactory in her mental health services because she had not participated in services since June 2020 and had been unsuccessfully discharged from mental health counseling. Further, Davina did not have a stable income or appropriate housing, and those conditions remained at the time of the termination hearing.

¶ 83    As the trial court addressed in its ruling, in February 2021, Davina began a relationship with Amos N., an individual with a criminal history which included violence. This relationship

33

brought the safety concern that brought the children into care squarely back into focus. Although Davina argued, and continues to argue on appeal, that there was no relationship with Amos N., the trial court correctly pointed out that whether the relationship was boyfriend-girlfriend, friend, or something else, there was clearly some kind of relationship with Amos N.

¶ 84   The testimony provided at the fitness hearing showed that in April 2021, Davina and Amos N. were involved in a domestic violence incident wherein Amos N. broke out Davina's car window and she fled from him in her vehicle while her driver's license was suspended. In testifying about that incident, Davina explained that Amos N. wanted to be in a relationship with her, but that she had explained her situation to him, and he got mad and was exhibiting stalking-like behavior. Despite this, Davina continued to have contact with Amos N. Davina acknowledged that in April 2022, Amos N. had poured motor oil in Davina's apartment. Davina was observed with Amos N. on May 24, 2021, at the Williamson County Courthouse. Further, Davina testified that she was aware that Amos N. was supposed to meet with her caseworker, indicating some relationship to the case. Finally, Amos N. was with Davina on January 31, 2022, when she was stopped by law enforcement.

¶ 85   In this instance, the conditions that were the basis for the children's removal were that Davina was continuing to allow contact between the children and Malik H., despite him being a perpetrator of domestic violence against Davina and her daughter. The continued contact with Malik H., even after DCFS became involved and began an intact case, endangered the children. Despite this, and after completing domestic violence and parenting services, Davina began, and continued in, another domestically violent relationship with Amos N. While Davina may have completed domestic violence counseling, she was not able to implement the information that she was provided and was unable to comprehend the danger that such men could pose to her children and her ability to regain custody.

34

¶ 86 Additionally, while Davina had completed parenting services, she remained unable to exhibit appropriate parenting skills during supervised and unsupervised visits with her children. A failure to learn and apply parenting skills can constitute a failure to make reasonable efforts to correct a condition that led to the removal of the children. See *In re J.P.*, 261 Ill. App. 3d 165, 174-75 (1994).

¶ 87 Turning to Davina's argument that the lack of a filed service plan prior to January 2021 set her up for failure, we disagree. This court acknowledges that sections 2-10.1 and 2-23(3) of the Act (705 ILCS 405/2-10.1, 2-23(3) (West 2020)) provide that DCFS shall file a case plan, also referred to as a service plan, within 45 days after a minor is placed in shelter care, and the trial court shall, at the dispositional hearing, determine if the services contained in the service plan are reasonably calculated to facilitate achievement of the permanency goal. The service plan is designed to, among other things, stabilize the family situation and reunify the family. See 20 ILCS 505/6a (West 2020). Further, section 2-28 of the Act, regarding permanency hearings, vests the court with oversight over the service plan, requiring the trial court to determine that the services contained in the plan are reasonably calculated to facilitate achievement of the permanency goal. 705 ILCS 405/2-28(2) (West 2020).

¶ 88 We first note that there is no dispute that the first service plan was filed with the trial court on January 26, 2021, well beyond 45 days after the children were taken into care. Although the trial court recognized the issue with the service plans not being timely filed and delays in services based on the COVID-19 pandemic, there is no credible evidence that Davina was unaware of the services she was required to complete. The services were listed in the dispositional report and each permanency report filed with the trial court. Further, Davina was present and represented by counsel at three hearings prior to the first filing of a service plan and three hearings after, where the trial court was tasked with determining whether the services in the plan were reasonably

35

calculated to facilitate the achievement of the permanency goal. While counsel complained at one permanency hearing about a lack of a service plan, Davina's attorney never objected to the services prescribed as being inappropriate, nor complained that Davina was unaware of which services to complete.

¶ 89    There is no controversy that DCFS should have filed each service plan with the trial court and provided copies to the children's parents and their counsel. While we do not excuse the failure of DCFS to follow the law, the evidence in the present case is clear that Davina was aware of the services she was required to complete. Davina took some part in her mental health services, completed domestic violence services, and parenting services. Davina also made some contact with a housing advocate, although she was discharged from that service for failure to engage with the advocate. The record is also clear that Davina was in continual contact with her caseworkers throughout the pendency of the case, who repeatedly informed and reminded Davina of the services that needed completion. Nonetheless, Davina never reengaged in mental health counseling despite being repeatedly advised to do so. Even if the lack of a filed service plan would have had some effect on Davina engaging in mental health counseling, from January 26, 2021, when the first service plan was filed, to the termination hearing, she failed to complete her mental health services.

¶ 90    Finally, Davina argues that DCFS impeded her progress when she was not granted additional visitation time sooner and that her ability to make reasonable efforts was complicated by the COVID-19 pandemic. The evidence is clear that Davina's visitation was curtailed due to the pending investigation regarding her eldest daughter and Davina's own inability to implement proper parenting skills during the visits, in addition to her involvement with Amos N. Further, although the COVID-19 pandemic did complicate services, there was no evidence here that it affected Davina's services to the extent that she was unable to participate and complete them.

36

¶ 91    Therefore, we find that the trial court's finding that Davina was an unfit person as defined in section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)) for failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the home during any nine-month period after the adjudication of neglect was not contrary to the manifest weight of the evidence. As noted above, only one count of unfitness needed to be proven for the trial court to find that Davina was an unfit person. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). Because we have determined that the trial court's finding that Davina failed to make reasonable efforts was not in err, we do not need to address the respondent's remaining issue relating to parental unfitness.

¶ 92                                III. CONCLUSION

¶ 93    For the foregoing reasons, we affirm the judgment of the trial court of Williamson County.


¶ 94    Affirmed.